ORIGINAL Receipt # 062899

ECF

FILED
MAY 16 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

HM² CORPORATION d/b/a HM² CONSTRUCTORS AND FABRICATORS
Plaintiff,

v.

No. 05-551C
(Judge

THE UNITED STATES OF AMERICA/NASA
Defendant.

_______________________________________/

# COMPLAINT

Plaintiff, HM² CORPORATION d/b/a HM² CONSTRUCTORS AND FABRICATORS, by and through its undersigned attorney, sues Defendant, THE UNITED STATES OF AMERICA/NASA, and as grounds therefore would show:

## General Allegations

## Parties and Jurisdiction

1. Plaintiff, HM² CORPORATION d/b/a HM² CONSTRUCTORS AND FABRICATORS (HM²), is a corporation organized and operating under the laws of the State of Florida, with its principal place of business in Brevard County, Florida, and is regularly engaged in the business of general and mechanical contracting throughout the State of Florida.

2. Defendant, THE UNITED STATES OF AMERICA/NASA is a branch of the United States government.

3. Jurisdiction is proper in this Court pursuant to contract paragraph 34 entitled "CONSTRUCTION CONTRACT SECTION VII – OTHER CONTRACT CLAUSES,

Article 1. LISTING OF FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES INCORPORATED BY REFERENCE," clause 52.233-1 Contract Disputes Act of 1978 (as amended), 41 U.S.C. 609(a)(1).

4. The Contract Disputes Act of 1978 (as amended), 41 U.S.C. 605(6)(c)(2), requires a Contracting Officer to whom a written claim has been submitted to issue a Final Decision or notify the Claimant as to the date a Final Decision will be issued within 60 days (if the claim exceeds $100,000 and is certified).

5. 41 U.S.C. 605(6)(c)(5) states that the Contracting Officer's failure to issue a Final Decision or notify the Claimant as to when a decision will be issued within 60 days of the date the claim is received (if the claim exceeds $100,000 and is certified) "will be deemed to be a decision by the Contracting Officer denying the claim and will authorize the commencement of the appeal or suit on the claim as otherwise provided in this chapter."

6. This suit seeks review of the Contracting Officer's Final Decision on three of $HM^2$'s claims, the Contracting Officer's Final Decision terminating the contract, and the Contracting Officer's deemed denials of two of $HM^2$'s claims.

   a. The Final Decisions denying claims are:

      i. Contracting Officer's Final Decision dated June 24, 2004 (Exhibit A: Claim and Final Decision);

      ii. Contracting Officer's Final Decision dated June 22, 2004 (Exhibit B: Claim and Final Decision); and

      iii. Contracting Officer's purported Final Decision of June 24, 2004 (Exhibit C). This "Final Decision" does not comply with regulatory and/or statutory

requirements for a Final Decision as it fails to advise the Contractor of its appellate rights.

iv. Contracting Officer's purported Final Decision of June 30, 2004 (Exhibit D). This "Final Decision" does not comply with regulatory and/or statutory requirements for a Final Decision as it fails to advise the Contractor of its appellate rights.

b. The claims which have been deemed denied by the Contracting Officer are:

i. HM$^2$ claim dated April 4, 2004, for time associated with delay in removal of ceiling tiles (Exhibit E: Claim and Contracting Officer response); and

ii. HM$^2$ claim dated May 21, 2004, on behalf of subcontractor, McDonald Air and Sheet Metal. As of the date of this Complaint, the Contracting Officer has not responded to that claim. (Exhibit F)

7. This suit additionally seeks a review of the Contracting Officer's Final Decision dated July 1, 2004, terminating HM$^2$s contract for default. HM$^2$ also seeks modification of the termination to one of Termination of Convenience for NASA to include the associated equitable compensation for damages to HM$^2$. While the Contracting Officer's letter failed to include the required statutory/regulatory notice of HM$^2$'s appellate rights, the Contracting Officer's letter states it is terminating the contract for default, demands that HM$^2$ cease all work, and demands that the surety complete the work, a copy of which letter is attached as Exhibit "G".

8. All conditions precedent to maintenance of this action have occurred, have been met, or have been waived.

**Factual Background**

9. On March 24, 2003, HM², as Prime Contractor, entered into a written agreement with NASA, as owner, for a project known as Replace AHUs in KSC Headquarters Building M-6-399 (Phases I, II, III) PCN 96899, 96899.1, 96899.2. A copy of that contract, NAS10-03026, is attached hereto as Exhibit "G"[1].

10. This contract required HM² to replace seven Air Handling Units (AHUs), in six separate rooms in the headquarters building for Kennedy Space Center (KSC).

11. The contract required that HM² have approved, delivered, and in its possession the replacement AHU prior to starting any removal work in the respective mechanical room.

12. The contract required HM² to do the work one mechanical room at time. As such, HM² could not accelerate the work by working in two or more mechanical rooms at the same time.

13. As the AHUs being replaced were providing air conditioning for critical administrative offices within the building, HM² could not begin the replacement of the first Air Handling Unit until a temporary air conditioning ystem was installed to provide air conditioning during the installation of the new Air Handling Unit.

14. Prior to developing a temporary air conditioning plan, HM² was to conduct an above- ceiling survey at "tie-in" locations. "Tie-in" locations are locations at which HM² was required to connect the temporary air conditioning system into the existing air conditioning system.

15. HM² could not perform any work directly associated with removal and replacement of the existing AHUs prior to the approval, installation, and activation of the temporary air system,

---

[1]The plans and specifications that are a part of the contract documents are extremely voluminous and have not been included as a part of the Exhibit. Upon information and belief, Defendant is in possession of a complete set of these documents.

and having possession of the approved replacement AHU. In developing its plan to replace the existing AHUs and install the temporary air conditioning system, $HM^2$ was disrupted and delayed for the following reasons, none of which is the fault of or within the control of $HM^2$.

Access Above-Ceiling Panels Claim

16. $HM^2$ was unable to perform the ceiling removal for inspection and work due to NASA's determination that special handling during the removal of the of the ceiling tiles was required because of the possible release of friable asbestos into the air creating a health hazard for the working personnel and for those that were working within the building. The Request for Offer (RFO) (basis of bid documentation and the contract subsequently awarded to $HM^2$) did not disclose the fact that removal and handling of the ceiling panels would create a health hazard.

17. On May 6, 2003, $HM^2$ advised the Contracting Officer that additional work not identified in the contract was being required by the Contracting Officer's Technical Representative (COTR) due to possible exposure to hazardous material not disclosed in the contract. This effectively stopped any ceiling tile removal, which would allow the contractor to start the above-ceiling survey, and work including the development of follow on work plans i.e., Temporary Air Conditioning & Control Wiring layout.

18. NASA continued to provide additional data indicating the extent of the previously undisclosed breathing hazards. $HM^2$ again notified the Contracting Officer of a changed condition affecting the contract cost and time on June 6, 2004.

19. NASA requested $HM^2$ to provide a proposal identifying the added costs associated with the ceiling tile removal on June 24, 2003, with specific instructions not to proceed. The timely

initial proposal was provided on July 1, 2003, by HM². The negotiation process started on July 11, 2003, and continued through several proposal revisions until September 22, 2003, when the COTR advised that NASA will withdraw their request for proposal and that Space Gateway Support LLC (SGS) would accomplish the ceiling tile removal, allowing HM² to start to perform the above-ceiling work immediately. (Note: the withdrawal of the request for proposal was verified by the Contracting Officer on September 24, 2003.)

20. SGS did not start the removal of the ceiling tiles until December 4, 2003, and did not remove the tiles required for the third floor temporary air conditioning connections to the existing ductwork until December 10, 2003.

21. NASA did not allow HM² to conduct the above-ceiling survey until December 10, 2003, more than 220 days after the initial plans to start the above-ceiling survey and nine months after the contract award. Based on HM²'s preliminary schedule, which was initially submitted to NASA on May 16, 2003, HM² planned to have the temporary air conditioning plan through the submittal process by July 11, 2003, As that plan could not be prepared until the above-ceiling inspection was complete, HM² experienced a minimum Government-caused delay of 21 weeks.

22. In NASA's termination letter dated July 1, 2004, NASA admits that HM² could not complete the temporary air plan until sometime after it was granted above-ceiling access and that NASA did not provide that access until December 5, 2003. Actually, access for the temporary air conditioning survey was provided only for the area required for the temporary air conditioning tie-ins associated with AHU-24 and not until December 10, 2003. No other areas requiring above-ceiling surveys to establish the temporary air conditioning connections

have been provided.

23. Given these facts, $HM^2$'s ability to perform was delayed by 218 days, which was beyond the control of $HM^2$ and for which $HM^2$ is not at fault.

Additional Asbestos Abatement Claim

24. In addition to conducting and performing the above-ceiling survey, $HM^2$'s contract required it to remove asbestos from various areas in which it was to perform its work, which were clearly identified in the bid/contract documents.

25. Shortly after the award $HM^2$ discovered there was a substantial amount of asbestos throughout the areas in which it was to perform work that had not been disclosed by NASA. For example, in the first room where $HM^2$ was required to perform work, the contract documents showed there was no asbestos abatement required when, in fact, there was a substantial amount of asbestos in the room. While other rooms showed a small amount of asbestos on the plans, $HM^2$ discovered there was substantially more asbestos than shown or required in the contract.

26. $HM^2$ advised the Contracting Officer of suspected additional asbestos contaminated material (ACM) in late August. In early October, NASA acknowledged the additional ACM and requested that $HM^2$ submit a proposal to perform the additional asbestos abatement. A proposal was provided by $HM^2$ by mid-October. While doing research for the proposal, $HM^2$ identified additional ACM material on October 16, 2003. NASA acknowledged the additional ACM material and requested a proposal from $HM^2$ on December 10, 2003. $HM^2$ provided a second proposal for the additional ACM work on January 8, 2004.

27. The first discussions regarding the $HM^2$ proposal submitted in mid-October and early January

were convened on February 16, 2004, and February 24, 2004. Without further discussions or direction by the Contracting Officer, on March 9, 2004, the NASA COTR advised that the abatement work would be accomplished by SGS after a seven-day advance notice by the contractor. HM² provided that notice on March 15, 2004.

28. NASA subsequently took the position that the additional asbestos abatement could not begin until the temporary air conditioning was provided. For reasons discussed below and without the fault and beyond the control of the contractor, HM² has not been able to establish temporary air conditioning as of the date of this termination for default.

29. As NASA has not yet performed any of the asbestos abatement work required before HM² could begin work, HM² has been unable to perform the work required by the contract.

<u>Temporary Air Conditioning Plan Claim</u>

30. In addition to being unable to provide the temporary air conditioning due to NASA's failure to timely remove asbestos, NASA has not, as of the date of the termination for default, approved HM²'s temporary air conditioning plan.

31. The plans and specifications of the contract called for HM² to provide a temporary air conditioning system consisting of one 110-ton capacity air-cooled chiller with pumped chilled water (CW) system and two air-handling units of 20,000 cubic feet per minute (CFM) each. This temporary air conditioning system was to be powered by a diesel electric generator mounted on trailers and was to produce 55° of coil temperature with 100% outside air.

32. During NASA's pre-award investigation of HM²'s ability to perform the work, HM² proposed an alternate temporary air conditioning system consisting of several DX units that would

provide the 110-ton cooling capacity called for in the contract. Unlike the chilled water units suggested by NASA, the DX units used Freon gas as opposed to chilled water. However, the cooling capacity of both air conditioning systems would be the same with only slight variations. The contractor advised that the location suggested by NASA for the electric generator was not viable as the required exhaust extension would not be allowed by the electric generator manufacturer and rental companies.

33. NASA agreed to $HM^2$'s approach and awarded the contract to $HM^2$ with the understanding that $HM^2$ would use the DX system as opposed to the chilled water system.

34. While $HM^2$ originally planned to provide for the complete temporary air conditioning system to be worked through the submittal process by July of 2003, $HM^2$ was unable to do so because it could not conduct the above-ceiling survey.

35. While $HM^2$ was unable to submit its plan due to a lack of survey information regarding above-ceiling conditions, NASA, in the status meetings held in September and October of 2003, consistently requested the status and source of $HM^2$'s delay in submitting the temporary air conditioning plan. Consequently, $HM^2$ submitted a portion of the plan prior to the above-ceiling survey with the understanding that the remainder would be provided as soon as $HM^2$ could perform its survey after NASA provided access to the above-ceiling areas.

36. $HM^2$ provided the first submittal in November, which was returned for correction in December. This was resubmitted in January with the portion of the submittal which required above-ceiling survey work and for which access had been provided on December 10, 2003, for the first temporary air conditioning connections. NASA disapproved these submittals in February, claiming the capacity of the submitted units would not be sufficient to provide for

temporary air conditioning.

37. HM² advised of inconsistencies between the specified requirements and the requirements demanded in the disapproval of the temporary air conditioning system submittal in late March. NASA subsequently advised in early April that there was a mistake in the contract requirements resulting in the need to double the required capacity of the temporary air conditioning system.

38. HM² advised of a changed condition requiring the Contracting Officer's direction on April 19, 2004.

39. In this regard NASA constructively changed the contract from a design specification under which HM² was to provide 110 tons of temporary air conditioning to a performance specification under which HM² was to provide whatever temporary air conditioning was needed to meet the new requirement.

40. While the Contracting Officer did not issue a formal contract modification, the COTR rejected the submittal based on the changed requirement. HM² promptly notified the Contracting Officer of the changed requirement and asked for either a contract modification to compensate HM² for the additional work or to direct the COTR to comply with the contract requirements, which only provided for HM² to provide 110 tons of cooling.

41. NASA refused to provide any direction regarding this issue other than that the contract requirements, although flawed, must be met. The COTR has advised that HM² is responsible for providing a functioning temporary air conditioning system. HM² subsequently hired a State of Florida Professional Engineer (PE) to provide a design that would meet the temporary air conditioning requirements while the AHUs were being replaced.

42. On June 30, 2004, $HM^2$ submitted for approval the revised submittal based on the engineering provided by the PE. As of the date of the termination for default, NASA has not acted on the submittal.

43. Despite $HM^2$'s notice to the Contracting Officer of the changed requirement, the Contracting Officer did not issue a change or direct the COTR to base his/her review of the submittal on the 110-ton cooling requirement in the RFO. As of the date of the termination for default, NASA has not approved $HM^2$'s temporary air plan.

44. Given NASA's failure to approve the temporary air plan or provide any direction regarding the defective contract requirements, it was impossible for $HM^2$ to perform any of the construction activities required by the contract.

Lift Plan Claim

45. $HM^2$ submitted a lifting plan stamped by a Florida PE as required by contract and in accordance with industry standards in $HM^2$'s submittal number 40 on August 29, 2003.

46. NASA failed to complete its review within the time provided in the contract, by taking 49 days to review the submittal, 28 days longer than allowed by the contract, and notified $HM^2$ that a Supplemental Agreement will be issued to provide this time extension.

47. The contract requirement is Section 02220, paragraph 1.7 "Contractor shall prepare and submit a detailed Lifting Plan fully addressing the work procedures, time-frames and safety precautions to be used to lift, remove, store, and reattach wall panels and air handling units. Lifting Plan shall be signed and sealed by a State of Florida Registered Engineer. The Lifting Plan shall address the means and methods to be used for storage and protection of the panels."

48. While the Lifting Plan submitted by HM² complied with this requirement, it was rejected by NASA.

49. In its rejection NASA reviewers made several demands that exceeded the requirements of the contract.

50. Essentially, NASA demanded that HM² reverse design the wall panels. NASA claimed to have no data on the existing construction and stated that the NASA engineers had no knowledge of the panel construction other than that the panels were made of concrete.

51. HM² advised the Contracting Officer that the contract documents did not contain the information required to "reverse design" the wall panels. HM² requested additional information and advised the Contracting Officer that this request was not in HM²'s scope of work.

52. The Government initially claimed that there was no other information available, but then recanted and provided some partially legible incomplete copies of as-built drawings from their archives. Request for Information Number 18 dated response of November 11, 2003, documents that these drawings would be provided.

53. Once HM² received the "new" information, a review of the documents revealed that the as-built drawings of the panels were substantially different from the panels depicted in the contract documents and HM² notified the Contracting Officer of the Differing Site Conditions in accordance with the contract.

54. HM² additionally requested that the documents (consisting of 14 sheets from the as-builts) be incorporated into the contract, that the Contracting Officer provide direction to HM² to add this to their scope of work, and that HM² be provided legible full-size copies of the as-

built drawings.

55. The Contracting Officer did add the documents to the contract and provided direction for HM² to proceed with the work on March 31, 2004, delaying the project by 187 days.

56. Through conversations held after receipt of the direction it was determined that additional direction was required and supplemental direction was provided on April 10, 2004.

57. As a result of the Government's actions, the contract has been delayed by this issue alone for 187 days through no fault of HM².

58. It is important to note that had HM² attempted to lift the panels based on the inaccurate and incomplete design information contained in the contract, there would have been an increased risk of damage to the panels due to the Differing Site Conditions.

59. The result of the additional requirements demonstrated that the original Lifting Plan submitted on August 29, 2003, was adequate and should have been returned Approved as Noted.

60. The calculations demonstrated that the panels were capable of supporting themselves. The added lifting fixture proposed by HM² to compensate for the original lack of information about the panels proved to do exactly what HM² envisioned and as the contract required despite the Differing Site Conditions revealed some four months later.

61. Due to the contract requirement that all elements of the project be approved prior to the start of any mechanical room work, this element of the submittal requirements delayed HM²'s ability to schedule/pursue the work and this delay was beyond the contractor's control.

62. While there were some simple review comments in NASA's original response that HM² could have resolved and resubmitted within a week, those corrections would not have

resolved the bigger issue of the added scope to provide calculations and the fact that the plans provided by NASA failed to correctly depict the panels that were in place.

63. $HM^2$ prepared a final re-submittal of the Lifting Plan for which $HM^2$ believed they had preliminary approval for all the elements and the Lifting Plan was again rejected based on new issues NASA has now raised.

AHU Connection Claim

64. On or about June 3, 2003, $HM^2$ submitted the technical specifications for the AHU equipment it proposed.

65. While the bid package provided by NASA stated the "basis for design" of the AHU equipment was equipment manufactured by York, the contract did not require the use of the York equipment.

66. During the pre-award investigation, $HM^2$ notified NASA it intended to install equipment manufactured by McQuay that met all contract requirements.

67. During the period between June 3, 2003, and September 11, 2003, $HM^2$ provided five iterations of submittals for the approval of the seven McQuay AHUs to be provided by $HM^2$ as replacement for existing AHUs.

68. The release for manufacture of the units was on August 22, 2003, based on the Approved as Noted status of the submittals for the AHU, inclusive of the coils contained within the AHUs.

69. This release was modified based on a meeting with the COTR on September 15, 2003, in which the added requirements addressed in the RFI's would be incorporated with a change for additional costs forthcoming, which would be for the notations which were additional to

the contract contained in the returned for correction submittal comments. This was confirmed to the Contracting Officer on September 17, 2003.

70. Based on direction then provided in a status meeting on September 22, 2003, that indicated a completely different interpretation of the responses to the RFIs, HM² believed that the AHUs as now released for manufacture would be unacceptable as they were being manufactured.

71. HM² stopped the manufacturer from continuing with production of the AHUs and advised the Contracting Officer of a changed condition requiring an adjustment of the cost and time to the contract on September 23, 2003.

72. A meeting with HM², the AHU manufacture, the COTR, and the Engineer was held after the October 7, 2003, status meeting in which the McQuay AHUs were discussed for suitability. HM² was prepared to start the process of procuring the AHUs from an alternate manufacture if the McQuay units were not acceptable as submitted.

73. Based on the agreements reached in the meeting on October 7, 2003, with the unit manufacturer, the AHUs were again released for production and staged delivery.

74. In late October the Contracting Officer initiated Supplemental Agreement #1 to address the AHU approval status and the delays to date associated with the ceiling tile removal (TN #1) and outage issues that had been part of ongoing discussions.

75. Supplemental Agreement #1 was issued and subsequently executed by HM² and the Contracting Officer in November.

76. Supplemental Agreement #1 clearly established that the McQuay AHUs were acceptable.

77. The first McQuay AHU was delivered in early January. The NASA inspection team

subsequently issued an NCR based on the steel male pipe supply and return connections not being in concert with the contract requirements. This issue was also applicable to the second McQuay AHU delivered shortly thereafter.

78. $HM^2$ notified the Contracting Officer of a changed condition for which added cost and time was required and a proposal was provided on January 16, 2004.

79. $HM^2$ advised in mid-February that lacking resolution of the steel male pipe supply and return connections, further releases of the McQuay AHUs would be delayed. In addition, the Contracting Officer's direction on how $HM^2$ was to proceed was required.

80. $HM^2$ was requested by the Contracting Officer in late February to provide alternate solutions to the issue resolutions, which may save cost and time in resolution of the dispute.

81. $HM^2$ provided alternate solutions in early March and advised that the Contracting Officer's direction was required to resolve the issue and mitigate the cost and time associated with the issue.

82. In early April, $HM^2$ notified the Contracting Officer through submission of two claims, one for the AHUs not delivered and one for the two delivered AHUs, demanding the Contracting Officer's direction in the form of a Final Decision.

83. In late June the Contracting Officer denied $HM^2$'s claims but still provided no direction on how to proceed. $HM^2$ was in the process of appealing the Contracting Officer's Final Decision when the termination for default was issued.

**<u>Count I - Breach of Contract</u>**

84. This is an action for breach of contract.

85. Plaintiff realleges, readopts, and reincorporates paragraphs 1 through 83 above as though

fully set forth herein.

86. Plaintiff fully performed its obligations under the contract between the parties to the extent it was not prevented from doing so by Defendant or excused from continued performance by Defendant's prior breach.

87. Defendant's breach of contract include but are not limited to the following:

a. Failure to provide Plaintiff with necessary access;

b. Failure to timely provide meaningful responses to Plaintiff's notifications of differing site conditions;

c. Requiring Plaintiff to perform work that was outside the scope of Plaintiff's contract;

d. Refusal to amend the contract to compensate Plaintiff for work it was required to perform that was outside the scope of the contract;

e. Wrongfully refused to approve submittals and accept materials that were in compliance with the contract requirements; and

f. Unreasonably hindered Plaintiff's performance of the contract.

88. In addition, as a matter of law, Defendant owed Plaintiff a duty of good faith and fair dealing in its administration of the contract.

89. Defendant breached its duty of good faith and fair dealing in that it:

a. Wrongfully terminated Plaintiff for default while Defendant was actively negotiating extra work on the schedule's critical path, which should have precluded the government from defaulting the contractor for failure to proceed;

b. Wrongfully terminated Plaintiff for default due to excusable delays and hindrance by the owner;

c. Improperly attempted to shift the responsibility for reverse designing the wall panels onto Plaintiff; and

d. Improperly attempted to change the contract from a design specification to a performance specification without compensating Plaintiff therefore.

90. As a direct and proximate result of the above breaches of contract and of the implied duty of good faith and fair dealing by Defendant, Plaintiff has incurred damages.

91. Plaintiff has retained the undersigned attorney and has agreed and obligated itself to pay a reasonable fee for his services, which fee it is entitled to recover from Defendant pursuant to the Equal Access to Justice Act.

WHEREFORE, Plaintiff, HM$^2$ CORPORATION d/b/a HM$^2$ CONSTRUCTORS AND FABRICATORS, demands judgment against Defendant, THE UNITED STATES OF AMERICA/NASA, for damages, for conversion of the termination for default to a termination for the convenience of the government, costs of this action, including a reasonable attorney's fee, and such other and further relief as this Court deems just and proper.

**Count II - Breach of Implied Warranty**

92. This is an action for breach of implied warranty of specifications.

93. Plaintiff realleges, readopts, and reincorporates paragraphs 1 through 83 above as though fully set forth herein.

94. As a matter of law, the Defendant, in releasing its design specifications, impliedly warranted the correctness and sufficiency of those specifications.

95. Defendant breached its implied warranty in that:

a. The contract did not disclose that removal and handling of the ceiling panels called for in the contract would create a health hazard;

b. The contract documents either failed to show the presence of asbestos-contaminated materials or showed that there was substantially less than was actually present;

c. The contract documents called for placement of the generator for the temporary air conditioning system in a location that would require modifications to the exhaust system which would not be allowed by the generator's manufacturer or rental agency;

d. The contract documents erroneously called for temporary air conditioning units that were of insufficient capacity; and

e. The wall panels were significantly different from those depicted in the contract documents.

96. As a direct and proximate result of the above breaches of Defendant's implied warranty of its specifications, Plaintiff has incurred damages, including but not limited to:

a. The unreimbursed costs of labor and materials; and

b. The unreimbursed costs of overhead and extended performance.

97. Plaintiff gave Defendant timely notice of the above breaches of Defendant's implied warranties.

98. Plaintiff has retained the undersigned attorney to represent it in this action and has agreed and obligated itself to pay a reasonable fee for his services, which fee Plaintiff is entitled to

recover from Defendant pursuant to the Equal Access to Justice Act.

WHEREFORE, Plaintiff, HM$^2$ CORPORATION d/b/a HM$^2$ CONSTRUCTORS AND FABRICATORS, demands judgment against Defendant, THE UNITED STATES OF AMERICA/NASA, for damages, costs of this action, including a reasonable attorney's fee, and such other and further relief as this Court deems just and proper.

**Count IV - Wrongful Termination**

99. This is an action for wrongful termination.

100. Plaintiff realleges, readopts, and reincorporates paragraphs 1 through 83 above as though fully set forth herein.

101. The Contracting Officer issued a letter terminating Plaintiff's contract for default. (Exhibit "G")

102. Termination for default in this case was wrongful. More specifically:

a. The termination took place while the parties were engaged in active negotiations regarding critical path issues;

b. The Contracting Officer failed to consider the terms of the contract and applicable law and regulations, the purported specific failures of Plaintiff, and the excuses for the failure as required by FAR 49.402-3(f);

c. All delays in Plaintiff's performance were beyond its control and without its fault;

d. The Contracting Officer disregarded the Defendant's breach of its responsibility not to hinder Plaintiff's efforts to perform; and

e. The Contracting Officer's decision to terminate the contract for default was

arbitrary, capricious, and an abuse of discretion.

103. As a direct and proximate result of the wrongful termination for default, Plaintiff has been damaged.

104. Plaintiff has retained the undersigned attorney to represent it in this action and has agreed and obligated itself to pay a reasonable fee for his services, which fee Plaintiff is entitled to recover from Defendant pursuant to the Equal Access to Justice Act.

WHEREFORE, Plaintiff, HM² CORPORATION d/b/a HM² CONSTRUCTORS AND FABRICATORS, demands judgment against Defendant, THE UNITED STATES OF AMERICA/NASA, converting the termination for default to a termination for convenience, for equitable adjustment, costs of this action, including a reasonable attorney's fee, and such other and further relief as this Court deems just and proper.

DATED this 13th day of May, 2005.

KINBERG & ASSOCIATES, LLC

By: ______________________
Edward J. Kinberg
Florida Bar #0996742
2101 South Waverly Place, Suite #200-E
Melbourne, Florida 32901
(321) 722-2006, Fax (321) 722-3352
Attorneys for Plaintiff