# Pre-Award Survey Questions

RFO 10-02-0037 for Construction of Replace Air Handler Units in KSC Headquarters Building – PCN's 96899, .1 and .2

1. Provide a listing of major HVAC projects of a similar size and scope completed in the last five years that would demonstrate your firm's ability to handle this project and include an Owner's contact person (and telephone number) who can verify your performance.

The majority of HM²'s project experience consists of non-HVAC work. Of their mechanical experience, piping and very small direct expansion (DX) HVAC unit replacement projects form the bulk. HM2 was only able to list two (2) projects as chilled water (CHW) HVAC projects. Pads A & B chiller modification and ECS humidification modification, both completed for USA, were CHW projects that were each awarded to HM2 for under $600,000 and were completed in approximately 6 months. The bulk of HM2's air handling unit (AHU) replacement experience consists of very small DX systems for facilities such as Popeye's restaurants and totaled less than $15,000 for each project.

During the Pre-Award Survey meeting, HM2 clearly stated they would rely on their subcontractors' experience in HVAC projects to supply the experience and wisdom needed for a project of the magnitude of the KSC HQ AHU replacement. The experience of the subcontractors they listed, however, is also limited to small, short-lived projects each less than $300,000 and lasting less than 10 months. The AHU's that were replaced by these projects were also much smaller than those that will be replaced at the KSC HQ Bldg. They are approximately only ¼ the size of the HQ AHUs. It was unclear if the projects listed for McDonald Air and Sheet Metal were chilled water or DX.

The controls subcontractor, Florida Controls, does list some chilled water project experience and their award amounts, although less than $160,000 for most projects, is on par with the expected controls amount for the HQ AHU project.

While HM2 stated they plan to rely on their subcontractors' experience for the HQ AHU project, they also stated they only plan to subcontract out 37% of the work. Thus, 63% of the project will be done by a contractor who admits to lacking experience with projects of this scope and size.

2. Have any of these projects required the replacement of Chilled Water AHU's?
   - If so, how many?
   - For each project:
     - What was the approximate mechanical contract price?
     - What was the building use (i.e. Office, Retail, Manufacturing, Healthcare, Multifamily)?
     - Approximately how many units were involved?
     - What was the average or total size (In Tons capacity or CFM)?

HM2's response to this question indicates they plan to view this project as "a series of connected projects". This view is somewhat correct, however a full, coordinated project view must be taken for some aspects of the project, notably



EXHIBIT C 1-8

16 2006

09644

the complex control system and overall project duration. The viewing of the entire project as a series of connected projects that are "within the Team's experience" is debatable as none of the experience given by HM2 indicates prior experience with AHUs of significant size and chilled water systems. Likewise, HM2's HVAC subcontractor, McDonald Air and Sheet Metal, Inc. has only one project listed that is financially equitable with even one AHU replacement in Phase 1. That project replaced eighteen (18) 25-ton AHUs in six (6) months. The fact that replacing (18) 25-ton AHUs in six (6) months is financially comparable to replacing (1) 110-ton AHU in two to three (2-3) months gives a good indication of the increased scope and responsibility associated with the HQ AHU project. HM2 also indicated they plan to perform the actual equipment setting for the HQ AHU replacement project. If this is truly the case, HM2 has absolutely no experience with such large, chilled water AHUs. Their experience with AHU replacement consists of only small, DX units for facilities such as fast food restaurants.

3. Was temporary A/C required for any of these projects?
   If so, how many?
   For each project:
      What was the capacity of the temporary units?
      Did the building remain occupied during the replacement?
      What type of temporary system was used?

HM2 admits to not having experience with the temporary A/C systems and scope required for this project. They do state that some of their employees have experience with temporary A/C systems. The temporary A/C plan HM2 has proposed utilizes different equipment than what was shown on the contract drawings. It is acknowledged the temporary A/C components vary by manufacturer and will require coordination by the Contractor with the actual equipment selected and careful review by the government to ensure their approach complies with the specified requirements. Their plan may work satisfactorily, however it is still being engineered and considered at this time The concept presented in the documents calls for more expensive temporary equipment and support of that equipment. HM2 noted they have included a larger generator exhaust discharge in their bid, demonstrating some consideration of related factors. HM2 stated they plan to subcontract the maintenance and emergency services for the temporary equipment to a local contractor because those services are readily available for DX systems. If HM2 must go to a chilled water system, like the one shown on the drawings, they will incur more costs for the equipment and services associated with it. The fact that HM2 is not completely sure the DX equipment will work is troubling because it could mean the costs used in their bid could significantly increase.

4. Have previous projects required the logistics of removing building exterior elements in order to replace the equipment?
   If so, how many?
   For each project:
      What elements needed to be removed?
      What was the construction type (CMU, Wall Panels, Block in-fill)?
      What temporary measures were used to maintain the building envelope?



EXHIBIT
Blumberg No. 5208
C 2-8
JUN 16 2006
09645

How long before the building was closed back up?

While HM2 stated they do not have experience in the removal of exterior wall panels as call[redacted] for in [redacted]s project, they did show experience in the erection of tilt wall construc[redacted]xperience, coupled with the obvious knowledge demonstrate[redacted] the [redacted]2 representatives at the Pre-Award Survey, indicates HM2 should [redacted]able to [redacted]rform this aspect of the project satisfactorily.

5. For this project:

Explain the sequence of events (tasks) to replace a typical unit with the anticipated time frame for each task. Assume all shop drawings have been approved, and equipment is available, starting with asbestos abatement.

The schedule provided by HM2 at the Pre-Award meeting had significant violations of the Contract embedded in it. The first obvious violation was found in the time frame allowed for the removal of the exterior wall panels. Per the Contract, "During these activities, the Contractor shall plan his work in such a way to minimize the time required to leave the building panel open. The opening shall remain open for a maximum of five (5) consecutive days and shall not carry over to a weekend of holiday." HM2's schedule showed the wall panels being off the building for an entire month. This is clearly unacceptable.

The second Contract violation was HM2's Just in Time (JIT) philosophy for AHU shipment and arrival. Per HM2's schedule and comments, they plan to order the AHUs at the same time and have the AHU manufacturer stagger the shipment dates, such that the AHUs arrive on the jobsite just as the Contractor is ready to install them. The Contract and specifications clearly indicate that the temporary A/C work may not commence until the AHUs are in the Contractor's possession and approved by the Contracting Officer. The Contract further states the AHUs are to be stored in a bonded warehouse until installation. (Please see Question 13 for more information on the bonded warehouse issue.)

HM2 stated their entire process, and thus their bid, is based upon the JIT philosophy. Clearly they did not read the Contract and specification section that prohibits any work from starting until the AHUs arrive and are approved. Furthermore, HM2 stated any storage costs incurred from having to store the AHUs in a bonded warehouse would be charged to the Government. Obviously they did not read or understand the Contract and specification sections dealing with the clear Contract requirements of the Contractor to provide the storage and reflect that cost in their bid price.

Because HM2 has based their entire process on the JIT philosophy, any change to the shipment and storage of the AHUs will impact their schedule and bid price. It is estimated, based upon HM2's figure of $75/ft$^3$ for storage, HM2's bid price will increase according to the following table. These figures were estimated using the Contract drawings basis of design for the AHU sizing and the assumption that the $75/ft$^3$ is a monthly storage fee and the AHUs would be delivered and stored one at a time rather than all at once.



EXHIBIT C 3-8

JUN 16 2006
09646

| | Original $ | w/ Storage $ |
|---|---|---|
| Phase 1 | $1,456,000 | [redacted] |
| Phase 2 | $1,570,000 | [redacted] |
| Phase 3 | $1,434,000 | [redacted] |
| Total | $4,460,000 | [redacted] |

The costs associated with the storage fees would place HM2 behind the second lowest bidder, Precision Mechanical, Inc.
In addition the time frame allocated for shop drawing review and approval does not consider the potential need for resubmittals. On a project of this size and complexity, historically more than one submittal is required, particularly for the complex items of equipment such as the AHU's. Task AP0001 (AHU Shop Drawings) only allots 10 days for NASA review/approval for the AHU's. In addition submitting a different approach for items such as the temporary A/C system has the potential to require more than one submittal.

The Contractor was not aware of the need to have his Test and Balance subcontractor provide a baseline reading on each system prior to beginning demolition.

6. For this project:
   How do you plan on addressing unanticipated outages of the temporary air conditioning system?
   Who will be responsible for their day-to-day operation?

HM2's answer to this question is acceptable provided the DX systems they plan to use can accommodate the exhaust vent stack requirements. (See Question 3 for more information.) If HM2 must switch to chilled water systems, additional costs may be incurred for the maintenance and emergency services.

7. How many projects have you completed that required commissioning?
   Who performed the commissioning (T&B Firm, Independent Engineer)?
   When would the commissioning agent first become involved with the work?

HM2's written response to the question seems to indicate they understand the intense commissioning requirements associated with this project. Their verbal responses at the Pre-Award Survey meeting indicated, however, that they view commissioning as an "organized approach for getting turn-over documents".

Specification section 15950 gives all requirements associated with the commissioning process. In addition, it also provides the Pre-commissioning checklist and the Functional Performance Test checklist. Both checklists are substantial in their requirements and are not the "old NASA way" of performing testing and balancing or commissioning.

The identification of an individual as the HM2 commissioning agent is promising. The fact that HM2 has never worked with the anticipated testing, adjusting and balancing subcontractor, BMI, is not so promising. It is unclear if HM2 clearly understands the commissioning requirements.



EXHIBIT C 4-8
Blumberg No. 5208
JUN 1 6 2006
09647
2/8

8. Has a test and balance firm been selected for this project?
   If not, who is under consideration?
   Have you completed projects of this magnitude with them in the past?

HM2 anticipates utilizing BMI as their TAB subcontractor. HM2 has no experience working with BMI, indicating their selection is likely price driven. No rational was offered for this subcontractor's selection (such as experience), which is troubling, given HM2's admission of limited AHU replacement experience, and stated reliance upon their "team" members

---

9. Has the AHU equipment manufacturer you plan to use been decided?
   If not, who is your apparent low bidder.
   What might influence your final decision?
   Are you willing to provide a quote breakdown by manufacturer?
   Which manufacturers has your firm purchased chilled water AHU/HVAC equipment of this size from in the past?

Any AHU manufacturer that meets all of the specifications is acceptable. HM2 was told to be aware of the sizes of the AHUs, as that can be the limiting factor in unit selection since the existing HQ mechanical walls are relatively small. HM2 stated the current cost spread between the AHU manufacturers they have requested quotes from is $207,000 with McQuay being the apparent low bid. In the questioning process it did not appear that HM2 had confirmed the physical size of the McQuay units and could incur additional costs should they determine in preparation of their layout drawings that the units are too large and they have to use equipment from a different manufacturer.

10. Explain your understanding of the controls requirements for this project, specifically:
    What type of communications protocol is required?
    What will be the role of your systems integrator?
    Have you decided on who will be your control subcontractor?
        If not, who is being considered?
        Have you worked with them in the past on a project of this magnitude?

HM2 stated they plan to subcontract the controls and system integration to Florida Controls. HM2's written response indicates their subcontractor has a satisfactory understanding of the project's controls requirements.

11. Do you feel the schedule is reasonable?
    Assuming a schedule slip, how would you try to recover?

Assuming HM2 can adjust their schedule to accommodate the 5-day wall panel removal constraint and elimination of the JIT delivery system and maintain their current schedule start/stop dates, they should meet the schedule constraints satisfactorily. However as noted above, under item 5 no allowance has been made for resubmittals. Both methods noted by the Contractor to recover from a schedule slip have the potential to increase the Contractors labor cost.



EXHIBIT
Blumberg No. 5208
C 5-8

JUN 1 6 2006
09648
5/8

12. Given the phased nature of the work, what is your plan to assure the necessary equipment and materials are available once the building exterior wall panel is removed?

HM2 appeared to be surprised by the Contract requirement to have the AHUs delivered and approved by the Contracting Officer prior to removing the exterior wall panels. Their planned JIT delivery system will thus have to be abandoned (which could significantly increase their costs). HM2's plan to have as much prefabricated materials as possible ready for installation prior to exterior wall panel removal is acceptable, although not critical as the basic materials can be placed in the mechanical rooms and the rooms sealed in time to meet the 5 day wall panel removal constraint.

13. Where do you plan to store the AHUs prior to bringing them to the jobsite?

Please see Question 5 for additional information on this topic.

HM2's planned JIT delivery of the AHUs violates the Contract requirement for "Air handling units shall be stored off-site within a bonded warehouse and be available for inspection at any time, Monday through Friday from 8:00 a.m. to 5:00 p.m. by the Contracting Officer." Should questions arise at the time of delivery regarding compliance with the specified requirements, the JIT process will place additional pressure on the Government to accept nonconforming materials, or cause significant delay and cost to the Contractor should the units be deemed to be non-conforming. As described by the Contractor, the JIT process once started will result in a delivery of units on a predetermined schedule. The Contractor further stated should a delay occur not directly attributable to their performance, they would seek compensation for "additional" storage costs, which would then cascade to the following unit deliveries. As the requirement for storage is clearly stated in the Contract documents, and should be included in the Contractors bid, there is no apparent benefit to the Government associated with the JIT approach.

HM2 stated they expected the Government to perform source inspection of the AHUs. Nowhere in the Contract documents is source inspection mentioned.

HM2 indicated a standard 11-week cycle would be needed for the manufacture and shipment of each AHU. This cycle was taken into consideration by the design team during the design process. Because AHUs are a long-lead item, any mistake or delay in their arrival at the job site would negatively impact the project. Based upon previous experience, the design team incorporated the arrival and storage of the units prior to any work commencing at the job site, to eliminate the possibility of delays in the project while the wall panels are off the building and building occupants are relying on the temporary A/C systems.

This project has received approval for only two (2) trailers to be set in the HQ parking lot and used by the Contractor. Thus, storage space is limited at the job site. A bonded warehouse was called for in the Contract and specifications to ensure adequate storage space is available and to ensure the AHUs are kept in a safe, weatherproof area.



Blumberg No. 5208
EXHIBIT
C 6-8

JUN 1 6 2006

Regardless of the justification for the Contract clauses, the fact remains that the clauses are part of the Contract and are violated by HM2's JIT plan. Because HM2 based their entire process on the JIT delivery system, their process and associated bid price are flawed.

Also, allowing HM2 to deviate from the Contract requirements to accomplish their JIT delivery system would not be equitable to the competing bidders who presumably based their estimates on the complete Contract requirements.

Responses to HM2's letter 02081-003 (Pre award survey Review responses):

It is evident that HM2 plans to continue to base their bid and project plan on the Just In Time delivery system. While they state the JIT system would allow them to deliver the AHUs to a bonded warehouse, they do not clearly state when that delivery is to occur. Their statement "The HM2 Team plan for the Temporary A/C startup, Existing AHU outage, and wall removal are all based on the delivery of the AHU." does not say when that delivery is to take place. The statement could be interpreted to mean that they will not begin the listed activities until they have a firm delivery date from the AHU manufacturer or until the AHU is in their possession. The statement also indicates HM2 still does not understand that the Contract states (on Specification page 19), "Temporary air conditioning units shall not be *installed* (not *startup*) until replacement air handling units are in the Contractor's possession."

Their letter indicates they expect NASA to provide *prompt* inspection of the AHUs upon arrival. The definition for "prompt" is not given. Should NASA not provide inspection in a prompt manner according to HM2's definition, would HM2 expect reimbursement for their storage fees during that time differential? Their statements at the Pre-Award Survey indicate they would. Storage fees should be part of their base bid and no claims should be addressed to NASA for basic storage fees. Obviously any additional storage fees incurred as a result of extraordinary events or delays that would fall outside of the reasonable project time frame (i.e. September 11 type events) would be considered for reimbursement by the Government. These events are truly extraordinary and cannot be estimated or predicted by anyone.

In the second paragraph, HM2 refers to "our proposed plan of execution". At the pre-award survey HM2's schedule was in significant error as to the limitation of five days for panel removal/reinstallation, the need for a Test and Balance baseline, or allocate any time for resubmittal of shop drawings. We are unaware of any specific items that may disrupt the Contractors plans, but at this stage there is doubt as to whether the "plan" addresses what one might reasonably expect (such as the likelihood of shop drawing resubmittals) from the contractual requirements. Section 01330 item 1.3 Submittals, fourth paragraph requires all SD-01, 02, 03, 04, 05, 07 and 08 submittals to be approved prior to starting work on that element of the project.

Response to HM2's estimate break down and bid confirmation letter 02081-002:



EXHIBIT C 7-8 7/8

JUN 1 6 2006 09650

While not detailed enough to provide a true comparison with the Government estimate, a few differences are apparent. HM2 has made no allowance for special conditions, which takes into account lost productivity and allotted Government downtime. It would be reasonable to anticipate working in a sensitive occupied building such as this there would be times where the Contractor's productivity will be impacted. HM2's experience on smaller AHU replacement projects (as reflected in his experience summary) does not provide evidence he is fully accounted for the complexities of working in an occupied building in his proposal.

---

Their cost figures do not readily account for the AHU storage that is to be incurred.



EXHIBIT
Blumberg No. 5208
C 8-8
JUN 16 2006
09651